IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

SUSAN V. HEWETT,            )
                            )
        Plaintiff,           )
                            )
    v.                      )     1:14CV684
                            )
CAROLYN COLVIN,             )
                            )
        Defendant.          )

MEMORANDUM OPINION AND RECOMMENDATION OF
UNITED STATES MAGISTRATE JUDGE

Plaintiff Susan V. Hewett ("Plaintiff") brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. § 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying her claim for Disability Insurance Benefits and Supplemental Security Income under, respectively, Titles II and XVI of the Social Security Act (the "Act"). The Parties have filed cross-motions for judgment [Doc. #12; Doc. #14], and the administrative record has been certified to the Court for review.

I. PROCEDURAL HISTORY

Plaintiff filed her applications for Disability Insurance Benefits on September 21, 2011, and for Supplemental Security Income Benefits on November 1, 2011, alleging a disability onset date of February 25, 2010. (Tr. at 207-16.)[1] Her applications were denied initially and

---

[1] Transcript citations refer to the Administrative Transcript of Record filed manually with the Commissioner's Answer [Doc. #8].

upon reconsideration. (Tr. at 58-132, 136-53.) Thereafter, Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ"). (Tr. at 154-55.)

On January 16, 2014, Plaintiff, her attorney, and an impartial vocational expert appeared at the subsequent hearing. (Tr. at 13.) The ALJ ultimately determined that Plaintiff was not disabled within the meaning of the Act (Tr. at 27) and, on June 14, 2014, the Appeals Council denied Plaintiff's request for review of the decision, thereby making the ALJ's conclusion the Commissioner's final decision for purposes of judicial review (Tr. at 1-4).

## II. LEGAL STANDARD

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of review of [such an administrative] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). "The courts are not to try the case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard." Hancock v. Astrue, 667 F.3d 470, 472 (4th Cir. 2012) (internal brackets omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1993) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270

F.3d 171, 176 (4th Cir. 2001) (internal citations and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is substantial evidence." Hunter, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the court should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ]." Mastro, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the ALJ." Hancock, 667 F.3d at 472. "The issue before [the reviewing court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996).

In undertaking this limited review, the Court notes that in administrative proceedings, "[a] claimant for disability benefits bears the burden of proving a disability." Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). In this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" Id. (quoting 42 U.S.C. § 423(d)(1)(A)).[2]

---

[2] "The Social Security Act comprises two disability benefits programs. The Social Security Disability Insurance

"The Commissioner uses a five-step process to evaluate disability claims." Hancock, 667 F.3d at 472 (citing 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4)). "Under this process, the Commissioner asks, in sequence, whether the claimant: (1) worked during the alleged period of disability; (2) had a severe impairment; (3) had an impairment that met or equaled the requirements of a listed impairment; (4) could return to her past relevant work; and (5) if not, could perform any other work in the national economy." Id.

A finding adverse to the claimant at any of several points in this five-step sequence forecloses a disability designation and ends the inquiry. For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied. The second step determines if the claimant is 'severely' disabled. If not, benefits are denied." Bennett v. Sullivan, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first two steps, and establishes at step three that the impairment "equals or exceeds in severity one or more of the impairments listed in Appendix I of the regulations," then "the claimant is disabled." Mastro, 270 F.3d at 177. Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's residual function[al] capacity ('RFC')." Id. at

---

Program . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantively identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

179.³  Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant work"; if so, the claimant does not qualify as disabled. Id. at 179-80. However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, which "requires the Commissioner to prove that a significant number of jobs exist which the claimant could perform, despite [the claimant's] impairments." Hines, 453 F.3d at 563. In making this determination, the ALJ must decide "whether the claimant is able to perform other work considering both [the claimant's RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." Hall, 658 F.2d at 264-65. If, at this step, the Government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. Hines, 453 F.3d at 567.

## III.  DISCUSSION

In the present case, the ALJ found that Plaintiff had not engaged in "substantial gainful activity" in the period between her alleged onset date through the date of the hearing. She therefore met her burden at step one of the sequential evaluation process. (Tr. at 15.) At step

---

³ "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." Hines, 453 F.3d at 562 (noting that pursuant to the administrative regulations, the "RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)). The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." Hall, 658 F.2d at 265. "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (*e.g.*, pain)." Hines, 453 F.3d at 562-63.

two, the ALJ further determined that Plaintiff suffered from the following severe impairments: multi-level degenerative disk disease of the lumbar and cervical spine with grade 1 spondylolisthesis at C3-C4, cervical radiculopathy, left ulnar neuropathy at the elbow; arthritis affecting nerve causing radiation of pain to right hip and leg; obesity; history of substance abuse; and anxiety disorder. (Tr. at 15-16.) Although the ALJ found at step three that these impairments did not meet or equal a disability listing (Tr. at 16-18), she determined that Plaintiff could only perform light work with myriad additional limitations, such that she could not return to her past relevant work under step four of the analysis (Tr. at 18-25). However, the ALJ concluded at step five that, given Plaintiff's age, education, work experience, and RFC, she could perform other jobs available in the community and therefore was not disabled. (Tr. at 26-27.)

Plaintiff now claims that the ALJ erred in two respects when assessing her RFC. Specifically, Plaintiff argues that the ALJ improperly evaluated both Plaintiff's credibility and the relevant opinion evidence. For the reasons set out below, the Court concludes that substantial evidence supports the ALJ's findings on both points, and Plaintiff's allegations of error are without merit.

    A.    Credibility

Plaintiff first contends that, in determining that her subjective complaints of pain were not credible, the ALJ (1) placed excessive emphasis on Plaintiff's activities of daily living, (2) failed to point to evidence regarding her pain related to her left ulnar neuropathy of her elbow,

6

(3) incorrectly indicated that Plaintiff was not receiving treatment for her anxiety order, (4) incorrectly noted that Plaintiff was noncompliant with her treatment, and (5) incorrectly assessed Plaintiff's statements regarding alcohol and her alcohol dependence.

In considering these contentions, the Court notes that the Fourth Circuit has provided a two-part test for evaluating a claimant's statements about symptoms. Craig, 76 F.3d at 594-95. "First, there must be objective medical evidence showing 'the existence of a medical impairment(s) which results from anatomical, physiological abnormalities and which could reasonably be expected to produce the pain or other symptoms alleged.'" Id. at 594 (citing 20 C.F.R. § 416.929(b)). If the ALJ determines that such an impairment exists, the second part of the test then requires the ALJ to consider all available evidence, including Plaintiff's statements about her pain, in order to evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work." Craig, 76 F.3d at 595.

Notably, while the ALJ must consider Plaintiff's statements and other subjective evidence at step two, he need not credit them "to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers." Id. This approach facilitates the ALJ's ultimate goal, which is to accurately determine the extent to which Plaintiff's pain or other symptoms limit her ability to perform basic work activities. Thus, a plaintiff's "symptoms, including pain, will be determined to diminish [her] capacity for basic work activities [only] to the extent that [her] alleged functional

limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. § 404.1529(c)(4). Relevant evidence for this inquiry includes Plaintiff's "medical history, medical signs, and laboratory findings," Craig, 76 F.3d at 595, as well as the following factors set out in 20 C.F.R. § 404.1529(c)(3):

> (i) [Plaintiff's] daily activities;
>
> (ii) The location, duration, frequency, and intensity of [Plaintiff's] pain or other symptoms;
>
> (iii) Precipitating and aggravating factors;
>
> (iv) The type, dosage, effectiveness, and side effects of any medication [Plaintiff] take[s] or [has] taken to alleviate [her] pain or other symptoms;
>
> (v) Treatment, other than medication, [Plaintiff] receive[s] or [has] received for relief of [her] pain or other symptoms;
>
> (vi) Any measures [Plaintiff] use[s] or [has] used to relieve [her] pain or other symptoms (e.g., lying flat on [her] back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and
>
> (vii) Other factors concerning [Plaintiff's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. § 404.1529(c)(3). Where the ALJ has considered these factors and has heard Plaintiff's testimony and observed her demeanor, the ALJ's credibility determination is entitled to deference.

In the present case, the ALJ determined that "the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms." (Tr. at 19.)

8

However, the ALJ found at step two that substantial evidence failed to support the intensity and persistence of the pain alleged by Plaintiff or the extent to which these impairments limited her ability to work. Therefore, the ALJ ultimately concluded that Plaintiff's impairments, although severe, were not disabling. In reaching this conclusion, the ALJ engaged in an extensive discussion of Plaintiff's symptoms and treatment. (Tr. at 18-25.) The ALJ separately addressed Plaintiff's multi-level degenerative disk disease of the lumbar and cervical spine (Tr. at 19), her left ulnar neuropathy of the left elbow (Tr. at 19), her arthritis (Tr. at 20), her obesity (Tr. at 20), her history of substance abuse (Tr. at 21), her anxiety disorder (Tr. at 22), and her mental impairments (Tr. at 23). With respect to each, the ALJ considered Plaintiff symptoms, diagnoses, and treatment. (Tr. at 18-25.) The ALJ went on to note that Plaintiff's levels of described daily activities are not limited as one would expect (Tr. at 23), that Plaintiff has some work activity after the alleged onset date, which, although not disqualifying, "indicate[s] that the claimant's daily activities have, at least at times, been somewhat greater than the claimant has generally reported" (Tr. at 23), that the treatment notes fail to corroborate Plaintiff's allegations of side effects from her medications (Tr. at 23), that there is evidence that Plaintiff was non-compliant (Tr. at 23), and that Plaintiff's testimony regarding substance use was inconsistent with her treatment notes (Tr. at 23-24) and the opinion evidence (Tr. at 24-25). In short, the ALJ made specific findings in support of her credibility determination (Tr. at 19-25), and that credibility determination is supported by substantial evidence, thus entitling the ALJ's credibility determination to deference.

Nonetheless, Plaintiff contends that the ALJ erred in several respects in making her credibility determination. First, Plaintiff argues that here, like in Hines v. Barnhart, 453 F.3d 559, 565-66 (4th Cir. 2006), the ALJ placed excessive emphasis on Plaintiff's activities of daily living in determining that her subjective complaints were not credible. In that regard, Plaintiff states that "[t]he ALJ noted her ability to take care of her cats and dogs, watch television, cook and do laundry, go outside daily, walk, shop, talk to others, use a checkbook and write checks and bathe herself." According to Plaintiff, "these activities are minimal and ignore testimony and objective medical evidence that Mrs. Hewett was in pain all of the time." (Pl.'s Br. [Doc. #13] at 3.)

The ALJ addressed Plaintiff's daily activities initially only as evidence supporting her observation the Plaintiff moves about well despite being slightly overweight. (Tr. at 22.) The ALJ separately went on to note that Plaintiff's described activities of daily living "are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." (Tr. at 23.) Specifically, the ALJ provided as follows:

> For example, she reported she has 15 cats inside and outside, 2 dogs and a bird. She also feeds a feral colony of cats in the woods. She also reported she searches for jobs on the internet and has applied at various retail stores by submitting her resume. She described that she maintains her home and feeds her animals, walks with her dogs, plays with her dogs and cats, and watches television. She talks to family, friends and neighbors, listens to music, cooks, washes dishes, cleans hours, vacuums, does laundry, and takes care of pets. She goes shopping with help, can handle her finances, use a checkbook and write checks, and bathe and dress herself. She indicated she can concentrate on a task until it is finished, understand and/or remember what she reads and sees on television, and has interests in reading, conversation and enjoying friends.

10

(Tr. at 23 (citations to exhibits omitted).) Moreover, the ALJ found that the record reflected work activity after the alleged onset date, which, although not constituting substantial gainful activity, "does indicate that the claimant's daily activities have, at least at times, been somewhat greater than the claimant has generally reported." (Tr. at 23.)

Substantial evidence supports the ALJ's determinations. Unlike Hines, this matter does not involve sickle cell anemia, where "patients are healthy between sickling episodes" and "pain is often the only or main symptom of an acute episode of illness." Hines, 453 F.3d at 561. Moreover, in Hines, the ALJ "selectively cited evidence concerning tasks which Mr. Hines was capable of performing" and found inconsistency where none actually existed. Id. at 565-66. In contrast, in this case, as described above, the ALJ engaged in a lengthy discussion of Plaintiff's symptoms and treatment and the objective medical evidence of impairments likely to cause Plaintiff's pain. (Tr. at 18-25.) Plaintiff's daily activities were only a fraction of that discussion, which included a normal physical examination in September 2011 (Tr. at 19), her "improved" status after her March 2013 surgery for her left ulnar neuropathy at the elbow (Tr. at 19), her ability to move well despite her weight (Tr. at 20), and Plaintiff's work activities after the alleged onset date (Tr. at 23). Accordingly, the Court cannot find that the ALJ selectively cited the record to inaccurately find an inconsistency as in Hines, or that the ALJ placed undue emphasis on Plaintiff's described daily activities.

Plaintiff goes on to argue that the ALJ incorrectly addressed the other evidence used to support her credibility determination. That is, Plaintiff also argues that the ALJ, while

referring to Plaintiff's surgery for her left ulnar neuropathy of her elbow, noted that her post-operative visit indicated she was improved and pleased with her surgery, but failed to point to evidence indicating that Plaintiff stated her pain remained a six or seven out of ten. (Tr. at 19-20, 512.) However, the ALJ did observe that the post-operative physical examination revealed "some mild sensory deficit to the fifth and fourth finger distally." (Tr. at 20.) Dr. Bey's impressions from that visit state: "Status post left ulnar decompression at the elbow, much improved, with some residual numbness at the left fifth and fourth distal digit." (Tr. at 512.) Dr. Bey further wrote: "We would like to see her back in 4 weeks. I encouraged her to use ice for any inflammation or swelling." (Tr. at 512.) This evidence is consistent with the ALJ's findings that Plaintiff continues to suffer some pain related to her left elbow, but not necessarily disabling pain. Indeed, Plaintiff's ongoing numbness and pain in her left hand are reflected in the RFC, which includes manipulative limitations for her left hand. (Tr. at 18.)

Plaintiff next contends that the ALJ incorrectly noted that Plaintiff was not receiving treatment for her anxiety disorder. In particular, Plaintiff notes that she was repeatedly prescribed Xanax, and asserts that "the ALJ's argument that Mrs. Hewett's treating physicians' prescriptions is not considered treatment is misplaced." (Pl.'s Br. [Doc. #13] at 4.) However, it is clear that the ALJ considered Plaintiff's prescriptions for Xanax by her treating physicians. (Tr. at 22.) The ALJ noted that Plaintiff's primary care physician prescribed medication for her anxiety order, and that Dr. Jackson increased Plaintiff's Xanax dosage to twice daily. (Tr. at 22, 557.) Specifically, the ALJ wrote:

12

> In terms of the claimant's alleged anxiety disorder, the medical evidence indicates her primary care physician prescribed medication for this condition. As previously discussed, Mr. Boulet diagnosed anxiety disorder during an assessment at Daymark Recovery Services, Inc. in September 2011. However, the record contains no further treatment for anxiety disorder. Dr. Sheldon-Morris diagnosed anxiety disorder during her evaluation in December 2011, as described above. At a clinic visit with Dr. Mishi Jackson in April 2013, the claimant reported increased anxiety. Dr. Jackson increased Xanax to twice daily. Subsequent visits with Dr. Jackson reveal normal mood and affect on examination.

(Tr. at 22 (citations to exhibits omitted).) The ALJ further noted that:

> As for the claimant's mental impairments of history of substance abuse and anxiety disorder, she underwent an assessment at Daymark in September 2011, but has had no further visits. Her primary care physician has prescribed medication for anxiety.

(Tr. at 23 (citations to exhibits omitted).) Accordingly, it is clear that the ALJ considered Plaintiff's anxiety medications and all of the medical records related to her anxiety disorder as part of her decision.

As to Plaintiff's contention that the ALJ incorrectly noted that Plaintiff was not compliant with her treatment, the ALJ noted simply: "There is evidence that the claimant was noncompliant." (Tr. at 23.) In support, the ALJ cited medical records indicating that Plaintiff was currently off of all medication and that, in particular, she was "off anticoagulants due to history of noncompliance" (Tr. at 377) and another stating: "History of pulmonary embolism, noncompliance. Alcoholism. She is off Coumadin due to this." (Tr. at 438.) The ALJ went on to note that, "although [Plaintiff] underwent a physical therapy evaluation in November 2012, she did not return thereafter." (Tr. at 23.) Indeed, a physical therapy discharge summary

13

dated December 13, 2012, marked boxes for "Goals not met" and "Did not return after initial evaluation." (Tr. at 496).

With respect to this discussion, Plaintiff contends that her compliance with her Coumadin prescription is not associated with her elbow, hip, back pain, and anxiety on which she bases her disability. (Pl.'s Br. [Doc. #13] at 4.) Moreover, Plaintiff contends that other than this this one indication that Plaintiff failed to complete physical therapy in 2012, "there is no further evidence that she was noncompliant with any other treatment." (Pl.'s Br. [Doc. #13] at 4.) Ultimately, however, the records cited by the ALJ support her conclusion that "[t]here is evidence that the claimant was noncompliant." (Tr. at 23.)

Lastly, Plaintiff takes issue with the ALJ's use of her past alcohol dependence in addressing her credibility. As Plaintiff notes, the ALJ wrote in her opinion: "Despite her testimony that she was not using alcohol since about 2011, she has had at least five medical visits since that time in which alcohol use was noted." (Tr. at 24.) Disputing that characterization of her testimony, Plaintiff cites the transcript in which she states: "I'm not saying I haven't had anything to drink, but as far as depending on it, I have stopped." (Tr. at 47.) However, during the hearing, prior to making that statement, when asked "Are you still using alcohol?," Plaintiff answered "No, ma'am." (Id.) When asked "When did you stop?", Plaintiff said, "I don't know. I haven't been drinking. I mean, New Year's Eve I had a glass of champagne toast. But I guess ever since I got that DUI and these medical problems and things, I --." (Id.) When asked "So you stopped drinking in 2011?", Plaintiff answered "Yes,

14

ma'am, pretty much." (Id.) The ALJ summarized this testimony in her opinion. (Tr. at 23-24.) Plaintiff contends that because she did not actually indicate that she had completely stopped drinking alcohol, the conclusion by the ALJ that any use of alcohol undermined Plaintiff's credibility was in error.

Regardless of whether Plaintiff's statements are construed as a representation that she completely stopped using alcohol, or only that she ended her alcohol dependency, the medical records undermine Plaintiff's testimony. As noted by the ALJ, a report from a January 2012 visit with Consultive Examiner Dr. Egnatz notes that Plaintiff has "pain, depression, and alcoholism" and that "[h]er alcohol has been a problem, the amount varies per week." (Tr. at 24, 430.) A September 2012 hospital record reveals that Plaintiff fell "while intoxicated last night." (Tr. at 24, 454) and noted a clinical impression of "[a]lcohol intoxication" (Tr. at 24, 455). Moreover, as the ALJ noted, Plaintiff's notes from Plaintiff's primary care physician identified alcoholism as an active problem in November 2013 and April 2013. (Tr. at 24, 539, 556.) Accordingly, the Court finds no error with the ALJ's analysis of Plaintiff's alcohol use as part of her credibility determination.

B. Opinion Evidence

Plaintiff further contends that the ALJ failed to explain what weight, if any, was assigned to Plaintiff's treating physicians' opinions. Plaintiff argues that she "routinely sought treatment from Dr. Richard D. Bey, M.D., Dr. Mishi Kayon Jackson, M.D., and Andrew

15

Secrest, PA-C.," and that "these opinions" indicate that Plaintiff continuously suffered from chronic neck, back, arm, shoulder and knee pain. (Pl.'s Br. [Doc. #13] at 5.)

The "treating physician rule" generally requires an ALJ to give controlling weight to the well-supported opinion of a treating source as to the nature and severity of a claimant's impairment, based on the ability of treating sources to "provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) [which] may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultive examinations or brief hospitalizations." 20 C.F.R. § 404.1527(c)(2). However, if a treating source's opinion is not "well-supported by medical acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record," it is not entitled to controlling weight. Social Security Ruling ("SSR") 96-2, 1996 WL 374188, at *5; 20 C.F.R. § 404.1527(c)(2); see also Craig, 76 F.3d at 590: Mastro, 270 F.3d at 178. Instead, the opinion must be evaluated and weighted using all of the factors provided in 20 C.F.R. § 404.1527(c)(2)(i)-(c)(6), including (1) the length of the treatment relationship, (2) the frequency of the examination, (3) the nature and extent of the treatment relationship, (4) the supportability of the opinion, (5) the consistency of the opinion with the record, (6) whether the source is a specialist, and (7) any other factors that may support or contradict the opinion.

If an ALJ does not give controlling weight to a treating source opinion, she must "give good reasons in [her] . . . decision for the weight" assigned, taking the above factors into

16

account. 20 C.F.R. § 404.1527(c)(2). "This requires the ALJ to provide sufficient explanation for 'meaningful review' by the courts." Thompson v. Colvin, No. 1:09CV278, 2014 WL 185218, at *5 (M.D.N.C. Jan. 15, 2014) (quotations omitted); see also SSR 96-2p (noting that the decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight"). Finally, opinions by physicians regarding the ultimate issue of whether a plaintiff is disabled within the meaning of the Act are never accorded controlling weight because the decision on that issue is reserved for the Commissioner alone. 20 C.F.R. § 404.1527(d).

Here, as the Commissioner notes, Plaintiff identifies no treating physician offering any opinion on the nature and severity of Plaintiff's impairments or on Plaintiff's restrictions in daily living. The records Plaintiff cites simply indicate that Plaintiff experienced some level of pain. (Tr. 376, 383, 471, 520, 539, 576.) That is, a January 5, 2011 Service Note indicates that Plaintiff complained of neck pain, but felt Vicodin was too strong for her and asked if she could be prescribed a weaker pain medication. (Tr. at 382.) The September 2, 2011, treatment note cited by Plaintiff states that plaintiff came in for "neck, back and shoulder pain." (Tr. at 376.) Plaintiff was assessed with "[n]eck pain, likely osteoarthritis" and prescribed "Voltaren 75 mg b.i.d. with meals, #60 Flexeril 10 mg up to t.i.d. p.r.n. #30. Heat, rest, daily stretches. Recheck in 2 weeks if not better. At that point, might consider x-ray and possible referral for

17

physical therapy." (Tr. at 376.)  The November 2012 after-visit summary reflects a diagnosis of back pain and provides: "pt requests referral.  Referred to Ortho at Baptist and Baptist denied referral.  Didn't like Lortab because it made her somnolent.  It did help the pain.  MRI Reviewed.  Showed arthritis."  (Tr. at 472.)  Notes from an October 1, 2013 exam provide an indication of right hip pain and findings of osteopenia (Tr. at 520), and notes from a subsequent October 2013 office visit provide that Plaintiff "describe[d] hip and leg pain when standing in front of her crock pot" and states that "[h]er back and leg pain appear to be mechanical."  (Tr. at 575-76.)  Notes from a November 2013 office visit state that Plaintiff presented with sciatica, that an MRI revealed L5 radiculopathy requiring a referral to orthopedics, and that Plaintiff's active problem list includes back pain.  (Tr. at 539.)  Accordingly, absent any opinion on the restrictions on Plaintiff's activities or the limitations on her ability to work, the treating physician rule is inapplicable here.  See, e.g., O'Connell v. Colvin, No. 6:13CV35, 2014 WL 4923951, at *15 (W.D. Va. Sept. 30, 2014) ("[The plaintiff's] challenge that the ALJ failed to credit Dr. Harman's 'opinion,' also fails because Dr. Hartman did not offer an opinion as to how [the plaintiff's] psychological functioning affected his ability to work. . . . Thus, the ALJ's obligation to give good reasons for any decision not to give controlling weight to a treating physician's opinion, see 20 C.F.R. §§ 404.1527(d)(2); 416.927(d)(2), does not apply here.").

The issue is then whether the treatment records were probative such that the ALJ committed error by not assigning those records weight in his decision.  See Hawkins v. Colvin,

18

No. 4:13cv15, 2014 WL 119259, at *12 (E.D. Va. Jan. 13, 2014). Here, as the treatment notes merely indicate that Plaintiff reported some level of pain, the evidence is entirely consistent with the ALJ's findings. That is, the ALJ found that Plaintiff experienced pain, as further discussed above. Again, however, there is no evidence that Plaintiff's treating physicians believed that pain to be disabling or believed that Plaintiff had additional limitations or restrictions that were not included in the RFC. Accordingly, substantial evidence supports the ALJ's evaluation of Plaintiff's treatment records in formulating her RFC.

IT IS THEREFORE RECOMMENDED that the Commissioner's decision finding no disability be AFFIRMED, that Plaintiff's Motion for Judgment on the Pleadings [Doc. #12] be DENIED, that Defendant's Motion for Judgment on the Pleadings [Doc. #14] be GRANTED, and that this action be DISMISSED with prejudice.

This, the 22nd day of February, 2016.

                                                        /s/ Joi Elizabeth Peake
                                                United States Magistrate Judge